**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

DELFINGEN US INC.,
*Plaintiff,*
v.

THE UNITED STATES OF AMERICA; DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection*; JAMIESON GREER*, in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*,
*Defendants.*

No. 26-cv-05059

***THREE-JUDGE COURT***

***REQUESTED***

**(28 U.S.C. § 255)**

**COMPLAINT**

Plaintiff Delfingen US Inc., ("Delfingen" or "Plaintiff"), by and through its attorneys, alleges as follows:

1. The President has once again imposed a global, economically drastic tariff regime, imposing a 10% import tax on the entire world without regard to the express requirements and limitations imposed by Congress.

2. This Court has been down this road before. Last year, a three-judge panel of this Court found that the President's claimed authority to impose unilateral and unlimited tariffs at his personal discretion exceeded any possible authority under the International Emergency

Economic Powers Act ("IEEPA")—and the Supreme Court ultimately agreed, striking down the President's IEEPA tariff regime. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 607 U.S. ___ (2026).

3. In explicit response to the Supreme Court ruling limiting his tariff power—indeed, on the same day the Supreme Court issued its decision—the President reimposed his global tariffs under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").

4. While Section 122, unlike IEEPA, does grant the President *some* power to impose tariffs, it does so under specific circumstances that do not currently exist, with specific limitations on the President's authority which he has declined to observe.

5. Indeed, Section 122 is limited to international balance-of-payments problems—problems it is economically impossible for the United States to suffer under our current system of floating exchange rates.

6. And Section 122 requires uniform treatment—the President cannot generally make exemptions on a policy basis. And yet the Section 122 Proclamation provides for many exemptions, in express violation of the terms of Section 122.

7. As with the IEEPA tariffs, this Court should find that the President's Section 122 tariffs exceed the tariff authority granted to him by Congress, and enjoin their operation, reaffirming once again what the Supreme Court made clear a few weeks ago: the imposition of tariffs is a power of Congress and can be exercised by the President only for the purposes it has granted to him, subject to those limitations Congress imposed. And if Congress has in fact delegated to the President the discretion to impose tariffs at his very whim, that discretion is an unconstitutional delegation of core Article I authority.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction under 28 U.S.C. § 1581, because this action is commenced against an officer of the United States and arises out of a law of the United States providing for tariffs. 28 U.S.C. § 1581(i)(1)(B).

9. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

10. Plaintiff Delfingen, was and remains the importer of record for certain merchandise imported into the United States and, in connection with those entries, paid Section 122 tariffs assessed upon importation. Plaintiff is therefore a “person adversely affected or aggrieved by agency action” within the meaning of 5 U.S.C. § 702 and 28 U.S.C. § 2631(i).

11. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

12. Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

13. Defendant United States of America is the federal government of the United States of America.

14. Defendant United States Customs and Border Protection is a federal agency, and a

component of the Department of Homeland Security, responsible for, *inter alia,* securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

15. Defendant Rodney S. Scott is the Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

16. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

17. Defendant Office of the United States Trade Representative is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

18. Defendant Department of Homeland Security is the federal agency of which Customs and Border Protection is a subagency.

19. Defendant Markwayne Mullin is the Secretary of the Department of Homeland Security. He is sued in his official capacity.

## **FACTS**

20. The Constitution vests all "legislative Powers" to Congress, beginning with the foundational "Power To lay and collect Taxes" and "Duties." U.S. Const. art. I, § 8, cl. 1. Because the President possesses no independent authority to impose tariffs, he may do so when exercising specific, limited power delegated by Congress under strictly defined conditions.

### **The Executive Actions**

21. On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to*

*Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025) (the "Liberation Day Order"),[1] which imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariff on nearly every country in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements governing the relationship.

22. In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," but ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country—not an accepted methodology for calculating trade barriers.

23. As a statutory basis, the Liberation Day Order, and the subsequent orders modifying that tariff regime, cited the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 *et seq*. ("IEEPA"); the National Emergencies Act, 50 U.S.C. § 1601 *et seq*.; Section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301.

24. On February 20, 2026, the United States Supreme Court held that the Liberation Day tariffs were *ultra vires*, because IEEPA does not grant the President tariff authority. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 607 U.S. ___ (2026). "The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope," the Supreme Court explained. "In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it." Slip op. at 20.

25. The same day, the President, in a press conference and in posts on social media,

---

[1] https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/

objected to the Supreme Court's decision, and announced that in response he would be issuing new replacement tariffs under other statutory authorities, including Section 122 of the Trade Act of 1974. 19 U.S.C. § 2132.

26. Later that day, the President issued Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems*, (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").[2]

27. The Section 122 Proclamation asserts that "the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium."

28. The Section 122 Proclamation further states that "senior officials have informed me that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."

29. According to the Section 122 Proclamation, "the United States runs a deficit in selling goods and services overseas, as reported by the United States Bureau of Economic Analysis (BEA) in the 'balance on goods and services'; has recently reflected quarterly deficits in its return on investment or labor, as reported by the BEA in the 'balance on primary income'; and runs a deficit in voluntary transfers, such as remittances, as reported by the BEA in the 'balance on secondary income.'"

30. "In other words," according to the Section 122 Proclamation, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into

---

[2] https://www.whitehouse.gov/presidential-actions/2026/02/imposing-a-temporary-import-surcharge-to-address-fundamental-international-payments-problems/

the country."

31. The Section 122 Proclamation therefore "find[s] that fundamental international payments problems within the meaning of section 122 exist; that those problems significantly harm United States national interests, including economic and national security interests; and that special measures to restrict imports are required to address those problems, as authorized by section 122."

32. The President imposed, based on claimed authority in Section 122, a surcharge of 10% on goods imported into the United States—the same amount as the global reciprocal tariff imposed under the original Liberation Day order—subject to various exemptions and carve outs, for 150 days, which is the maximum duration allowed by Section 122 without congressional approval.

33. The Section 122 Proclamation includes two Annexes, detailing which categories of imports the new tariffs apply to, as well as a variety of exempted products. Exemptions include aircraft components, citrus juice, automobile components, semiconductors, and Acai.[3] There are also exemptions for various countries—including Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.

34. The following day, the President, via a social media post,[4] announced that he was increasing the new global Section 122 tariffs to 15%, the maximum allowed by the statute.[5]

35. The 10 percent tariffs went into effect on February 24, 2026.[6]

---

[3] Annex II lists 76 pages of products exempt from the tariffs imposed by the Section 122 Proclamation.
[4] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/116109447886304328
[5] At the time of filing, it is unclear when or whether the 15% tariffs will go into effect.
[6] U.S Customs and Border Protection, *CSMS # 67844987 – Imposing Temporary Section 122 Duties* (Feb. 23, 2026) (available at https://content.govdelivery.com/bulletins/gd/USDHSCBP-40b3b7b?wgt_ref=USDHSCBP_WIDGET_2)

**Section 122**

36. Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, is titled "Balance-of-payments authority," and permits the President to impose "temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems." 19 U.S.C. § 2132(a).

37. Section 122 permits the President to impose tariffs for 150 days under specific circumstances, to address specific problems: either (1) "to deal with large and serious United States balance-of-payments deficits;" (2) "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets;" or (3) "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." *Id.*

38. The Section 122 Proclamation claims the United States has a balance-of-payments issue, in the form of large and persistent trade deficits—the first category. The President has not made assertions relevant to the second and third categories.

39. When such "fundamental international payments problems require special import measures," Section 122 permits the President to proclaim for up to 150 days "a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . ." *Id.*

40. This import surcharge must be imposed on a nondiscriminatory basis across different countries—that is, the 15% tariff "shall be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d).

41. The Trade Act of 1974 defines the term "nondiscriminatory treatment" as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9).

42. Section 122 provides an exception to the nondiscrimination provision, but it is limited, providing that if "the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action." 19 U.S.C. § 2132(d)(2).

43. Section 122 additionally requires that "[i]mport restricting actions proclaimed pursuant to subsection (a) shall be of broad and uniform application with respect to product coverage . . . ." 19 U.S.C. § 2132(e). That is, Section 122 requires equal treatment not just among different countries but also among types of imports.

44. There is a limited exception to this as well, "where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." *Id.*

45. However, "[s]uch exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." *Id.*

46. "In addition, uniform exceptions may be made where import restricting actions will be unnecessary or ineffective in carrying out the purposes of this section, such as with respect to articles already subject to import restrictions, goods in transit, or goods under binding contract." *Id.*

47. But "[n]either the authorization of import restricting actions nor the determination of exceptions with respect to product coverage shall be made for the purpose of protecting individual domestic industries from import competition." *Id.*

48. Section 122 therefore permits the President to impose tariffs of up to 15%, for a

period of up to 150 days, subject to explicit limitations: it must be to remedy a balance-of-payments deficit and must be generally uniform across countries and categories of goods. The Section 122 Proclamation does not adhere to these limitations.

49. The United States is not experiencing a balance-of-payments deficit. Indeed, it is *impossible* for the United States to experience the sort of balance-of-payments deficits envisioned by Section 122 under current economic conditions.

50. The Section 122 Proclamation treats the existence of bilateral trade deficits in goods as a balance-of-payments deficit, but these are distinct economic phenomena.

51. At the time Congress was considering the Trade Act of 1974, it was believed that the United States would adhere to a fixed exchange rate monetary system, like it had under Bretton Woods.

52. Under the Bretton Woods system, other countries around the world could convert their currency into dollars at fixed exchange rates, and dollars could in turn be converted into gold bullion. This created a potential problem: if prevailing conditions make conversion into gold appealing, the United States government ran the risk of too many dollars being converted, depleting U.S. gold reserves to meet its commitments. *See Recent Changes in Monetary Policy and Balance-of-Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964).

53. Precisely this state of affairs occurred in the early 1970s. Faced with dwindling gold reserves, and a large and persistent deficit in the balance of payments, President Richard Nixon came up with the "Nixon shock," suspending the conversion of dollars into gold and imposing, among other policies, temporary tariffs to mitigate the effects of that crisis. Proclamation No. 4074, 85 Stat. 926 (1971).

54. The Nixon tariffs were controversial, and it was unclear whether President Nixon had the authority to impose them. They were invalidated by the predecessor of this Court, but ultimately the predecessor of the Federal Circuit held that President Nixon had the authority to impose the tariffs at issue under the Trading with the Enemy Act of 1917. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

55. By the time of the *Yoshida* decision, Congress had already acted, passing the Trade Act of 1974, including Section 122, with the specific purpose of granting authority for the type of action Nixon had taken—subject to specific rules laid down by Congress to cabin presidential discretion.

56. And the court in *Yoshida* stated that any tariffs imposed in response to balance-of-payments problems after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, "must, of course comply" with Section 122. 526 F.2d at 582 n.33.

57. But, until now, no president has ever used Section 122 to impose balance-of-payments tariffs. That's because the conditions it contemplates—a balance-of-payments deficit akin to that Nixon faced in the early 1970s—has not occurred since before Section 122 was passed.

58. In 1976, the United States entered the Jamaica Accords, which formally ended the Bretton Woods monetary system. Since then, the United States has operated in a floating rate exchange system. Because the exchange rate automatically adjusts, balance-of-payments deficits are no longer economically possible after the end of Bretton Woods.

59. The simple fact is that "a system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market there cannot be a surplus or a

shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

60. As the 1963 report from the Joint Economic Committee explained, "[t]he [balance-of-payments] deficit under the official U.S. definition, measures the reduction in U.S. . . . monetary reserve assets (chiefly gold) and the increase in liquid liabilities. Stated another way, it measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." Joint Econ. Comm., 88th Cong., *The United States Balance of Payments-Perspectives and Policies* 3 (Comm. Print Nov. 12, 1963).

61. The balance-of-payments deficit is not the same as the trade deficit—rather, the U.S. trade deficit in goods is a *subset* of the overall balance of payments calculation and is conceptually distinct from a balance-of-payments deficit.

62. The Section 122 Proclamation notes only those aspects of the United States balance-of-payments calculation that are currently negative—while ignoring those positive aspects that counterbalance the claimed deficits.

63. There are three elements of the balance of payments: the current account, the capital account, and the financial account. *See* U.S. Bureau of Economic Analysis, Balance of Payments (Apr. 11, 2018).[7]

64. The deficits claimed in the Section 122 Proclamation are current account deficits. Indeed, the primary deficit identified—the balance of trade—is itself only one subset of the

---

[7] https://www.bea.gov/help/glossary/balance-payments

current account calculation. The current account consists of transactions between U.S. residents and nonresidents in goods, services, primary income, and secondary income. U.S. Bureau of Econ. Analysis, *U.S. International Transactions Release—Additional Information*, https://www.bea.gov/news/trans-release-additional-information (last visited Mar. 9, 2026) (describing the components of the current account).

65. Congress was aware of this distinction, which is why Section 122 itself distinguishes between "balance-of-payments" and "balance-of-trade." Section 122 grants the President specific authority to *reduce* tariffs to deal with "large and persistent United States balance-of-trade *surpluses*" (emphasis added)—yet the Section 122 Proclamation claims the inverse power to raise tariffs to confront trade deficits. *See* 19 U.S.C. § 2132(c). Section 122 does not grant the president that power.

66. The Section 122 Proclamation completely ignores the effect of the financial and capital accounts—which represent inflows that counterbalance the current account deficits the President identifies. The President is claiming the balance is off by looking at only one side of the scale.

67. When these mitigating elements are added to the calculation, the claimed balance of payments problem disappears. The current U.S. balance-of-payments discrepancy of approximately $53 billion represents only 0.2 percent of GDP—a figure so statistically insignificant in a multi-trillion-dollar economy that it cannot be characterized as "large and serious" as required by Section 122. *See U.S. Bureau of Econ. Analysis, U.S. International Transactions Release—Additional Information*, https://www.bea.gov/news/trans-release-additional-information (last visited Mar. 9, 2026) (defining "statistical discrepancy").

68. In defending the unlawful IEEPA tariffs, the Solicitor General agreed as much,

explaining that the choice IEEPA instead of Section 122 was because Section 122 does not apply to the facts at hand: "Nor does [Section 122] have any obvious application here, where the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Br. for Appellants, *V.O.S. Selections, Inc. v. Trump*, Federal Cir. No. 25-1812, at 13. The Senate report on Section 122—which the President cited in his brief—explains the possibility that large trade deficits could in fact exist with a balance-of-payments *surplus*. S. Rep. No. 93-1298, at 89 (1974) (recognizing the possibility of "a large payments surplus" at the same time as "a large trade deficit").

69. The President made this admission in more than one federal court: "the President's actions here [under IEEPA] do not identify or focus on balance-of-payments concerns of the type addressed by Section 122. Instead, the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Br. of Appellants, *Learning Resources, Inc. v. Trump*, D.C. Cir. No. 25-5202, at 19 (also citing S. Rep. No. 93-1298, at 89).

70. But when the Supreme Court held that the President lacked authority under IEEPA to impose tariffs, he responded by doing the exact thing he told the federal courts he could not do: use Section 122 as a replacement to IEEPA to impose worldwide tariffs due to the United States trade deficit.

71. Indeed, four judges of the Federal Circuit—who dissented from that court's holding that IEEPA did not authorize the President's Liberation Day tariffs—agree that the "particular problems recited in [the Liberation Day order] to establish the statutorily required unusual-and-extraordinary threat are not focused on a 'monetary crisis,' . . . that gave rise to

Congress's enactment of section 122." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1360 (Fed. Cir. 2025) (Taranto, J., dissenting) (joined by Moore, C.J., Prost, J., and Chen, J.) (citing S. Rep. No. 93-1298, at 87–89 (1974); H. R. Rep. No. 93-571, at 27–31 (1973)). Rather, the President's actions are "focused on deficiencies in 'domestic production' (including deficiencies in 'the U.S. manufacturing and defense-industrial base' and to the nation's making of agricultural products) wholly or partly caused by the purchase of imported goods made abroad in place of domestically made goods." *Id.* at 1360–61.

72. The Section 122 Proclamation is simply a relabeling of these concerns from the Liberation Day Order, dressed up as a "balance-of-payments" deficit to justify imposing worldwide tariffs under Section 122 to address the trade deficit. But Section 122 does not give the President the power to impose tariffs to address the trade deficit. Nor may he ignore the obvious definition of the term "balance-of-payments" to mean whatever he wants.

73. Moreover, the President is not adhering to the requirements within Section 122 itself, which requires that tariffs imposed be uniform, outside narrow exceptions. The Section 122 Proclamation's exceptions are not narrow and are not limited to those categories allowed by Section 122—instead, they are the President's policy preferences. But Section 122 does not give the president that discretion.

74. The Annexes make no findings to demonstrate that the exempted goods are "limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." 19 U.S.C. § 2132(e). Rather, the President simply exempted those goods he finds it prudent to exempt—which is not a level of discretion the statute gives him.

75. Nor do the Annexes make any findings regarding the discrimination between

countries. Section 122 only allows distinctions between countries where some subset of countries is a particular problem, under which circumstances the President can limit his action to those countries. 19 U.S.C. § 2132(d)(2). The President has done the opposite: imposing worldwide tariffs while exempting certain nations. Section 122 explicitly forbids that.

**The CIT's May 7, 2026 Decision**

76. On May 7, 2026, in *State of Oregon, et al. v. United States* and *Burlap and Barrel, Inc., et al. v. United States.* Slip Op. 26-47 (Ct. Nos. 26-01472 and 26-01606), a three-judge panel of this Court (Barnett, C.J., and Kelly, J., with Stanceu, J., dissenting) held that Proclamation No. 11012 is invalid as *ultra vires* of Section 122.

77. Reviewing the legislative history of the Trade Act of 1974, the Court held that "balance-of-payments deficits" in Section 122(a)(1) is "a term of art, susceptible to a defined meaning, and subject to objective measure within the traditional means of judicial review." Slip Op. 26-47 at 32. The Court concluded (*id.* at 33): "The legislative history of the Trade Act of 1974 reveals that Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance."

78. Applying that construction, the Court held that Proclamation No. 11012 "relies upon current account deficits, and a discussion of 'a large and serious trade deficit,'" but that "[n]owhere does Proclamation No. 11012 identify balance-of-payments deficits within the meaning of Section 122 as it was enacted in 1974." Slip Op. 26-47 at 45-46.

79. The Court rejected the Government's position that the President may select among sub-accounts of the balance of payments to identify a balance-of-payments deficit, reasoning that "if the President has the ability to select among the sub-accounts to identify a balance-of-

payments deficit, unless every sub-account is balanced, the President would always be able to identify a balance-of-payments deficit." Slip Op. 26-47 at 39. Such an open-ended reading, the Court held, "would raise a non-delegation issue, which in turn would prompt a constitutional question" and so must be disfavored under the canon of constitutional avoidance. *Id.* at 40.

80. The Court further held that the Government's own declaration "plainly acknowledges that the Proclamation does not rely upon the metrics used to measure balance-of-payments deficits discussed at the time of enactment." Slip Op. 26-47 at 42 (citing Decl. of Pierre Yared ¶¶ 43-44, ECF No. 35-1).

81. The Court concluded (Slip Op. 26-47 at 46): "Because the Proclamation's use of trade and current account deficits to stand in the place of balance-of-payment deficits within the meaning of the statute renders the Proclamation ultra vires ... Proclamation No. 11012 is invalid, and the tariffs imposed on Plaintiffs are unauthorized by law."

82. The Court entered a permanent injunction in favor of, and ordered refunds with interest to, the three plaintiffs the Court found had standing as direct importers: the State of Washington (through the University of Washington), Burlap and Barrel, Inc., and Basic Fun, Inc. *See* Slip Op. 26-47 at 52-53; Judgment, ECF No. 39, Ct. No. 26-01606 (May 7, 2026). The Court expressly declined to issue a universal injunction, holding that "such relief is not merited here." Slip Op. 26-47 at 51.

83. On May 8, 2026, the Government filed Notices of Appeal in both consolidated actions. The Federal Circuit has docketed the appeals as No. 2026-1804 (*Oregon*) and No. 2026-1805 (*Burlap and Barrel*). As of this writing, those appeals remain pending before the Federal Circuit, and no ruling on the meris has been issued.

## COUNT I

### THE PRESIDENT'S SECTION 122 TARIFFS EXCEED HIS STATUTORY AUTHORITY.

84. The preceding paragraphs are incorporated herein by reference.

85. The Section 122 Proclamation imposes a 10% tax on goods imported from anywhere in the world (except where he has decided to make an extra-statutory exemption). This is estimated to cost some $35 billion over the next 150 days, and over a $900 billion over ten years if this action is extended. Comm. for a Responsible Fed. Budget, *How Much Will Trump's New 10% (or 15%) Tariffs Raise?*, (Mar. 4, 2026).[8] If President Trump increases the rate to 15%, the cost rises to $50 billion, and well over a trillion dollars over the next decade. *Id.*

86. This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See*, *e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $430 billion in student loan forgiveness); *West Virginia v. EPA*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

87. Presidential authority to unilaterally impose worldwide tariffs must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades, and not by redefining established terms of art to mean things the words Congress used don't mean. *See NFIB*, 595 U.S. at 125

[8] https://www.crfb.org/blogs/how-much-will-trumps-new-10-or-15-tariffs-raise.

(Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) ("Congress does not usually 'hide elephants in mouseholes.'").

88. Section 122 allows the President to impose special import measures, including tariffs, when fundamental international payment problems exist, for three reasons: (1) "to deal with large and serious United States balance-of-payments deficits;" (2) "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets;" or (3) "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a).

89. The Section 122 Proclamation does not identify any significant depreciation of the dollar in foreign exchange markets or to cooperate with other countries in correcting an international balance-of-payments disequilibrium. Instead, it simply asserts that the tariffs are justified to deal with large and serious United States balance-of-payments deficits.

90. But no large and serious balance-of-payments deficit exists in the United States. Indeed, our current economic framework makes it impossible for such a deficit to exist. Instead, the President has attempted to redefine the term balance-of-payments deficit to mean trade deficit.

91. No president, until now, has attempted to use Section 122 to impose tariffs to combat trade deficits, even though the United States has carried a trade deficit every year since 1976.

92. The existence of trade deficits in goods with some other countries does not qualify as a balance-of-payments deficit, as required by Section 122.

93. The existence of trade deficits in goods with some other countries is not a fundamental international payments problem, as required by Section 122.

94. Because the Section 122 Proclamation fails to identify a balance-of-payment deficit within the meaning of Section 122, it is *ultra vires* of the President's statutory authority.

95. Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades old statutes. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

96. Indeed, Congress passed Section 122 to *limit* the Presidents discretion, allowing the policy approach President Nixon took only under specific circumstances and with specific limitations, all of which the Proclamation declines to observe.

97. Congress knows how to grant the President authority to impose or adjust tariffs to address issues with the balance of trade—19 U.S.C. § 2132(c) expressly provides authority to the President to impose tariffs when there is a *surplus* in the balance of trade, but it does not authorize the President to impose tariffs to deal with balance of trade *deficits*.

98. The President's interpretation of Section 122 is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

99. Section 122 does not grant the President power to impose tariffs under these circumstances—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

100. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Util. Air Regul. Grp.*, 573 U. S. at 324). The assertion that Section 122 grants the President his claimed authority raises a major question that requires Congress to speak

clearly in granting such a broad and consequential power to upend the global economy.

101. "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

102. Moreover, the exemptions and exceptions the President has made are in direct violation of the text of Section 122, which requires generally uniform treatment the President is declining to observe.

103. The tariffs illegally imposed by the President via Section 122 directly and irreparably harm Plaintiff.

**Count II**

**THE PRESIDENT'S INTERPRETATION OF SECTION 122 VIOLATES THE NONDELEGATION DOCTRINE.**

104. The preceding paragraphs are incorporated herein by reference.

105. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1.

106. The nondelegation doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and "all" such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise

reallocate it.”).

107. Implicit in this set-up is the premise that neither branch may delegate its sphere of power to any other. “The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations].” Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

108. “The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.” *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

109. The Court therefore requires that any grant of regulatory authority be provided with an “intelligible principle” that will form the basis of agency action. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

110. The basic requirement that derives from the Supreme Court’s cases is that “Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress’s guidance has been followed.” *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)).

111. If Section 122 did grant the President the broad, standardless discretion he claims, allowing him to redefine the term “balance-of-payments deficit” to mean a trade deficit—which it does not—and has done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

112. If there are any constitutional limits to delegation at all, they apply here, in a case where

the executive claims authority to impose massive tax increases and start a worldwide trade war. This, like the IEEPA tariffs before it, is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; *see id*. at 542 (noting that the NRA gave the "virtually unfettered'' discretion to the president "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country").

113. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't,* 448 U.S. at 645.

114. This interpretation would render Section 122 the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. at 474.

115. This interpretation of Section 122 would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't*, 448 U.S. at 646 (citing *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

116. If the President can treat a period without a balance-of-payments deficit as a crisis for his own convenience, the same could be said of virtually any international economic transaction he disapproves of. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

117. And if the President is allowed to ignore specific limitations set forth in Section 122, such as the nondiscriminatory requirement, then the limits of Section 122 are meaningless, and the

delegation of Congress's power to impose tariffs is nearly limitless.

118. The President's interpretation of Section 122 provides no intelligible principle limiting the imposition of tariffs.

119. The Section 122 Proclamation unlawfully imposes tariffs that directly and irreparably harm Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seek damages and equitable relief in connection with Defendants' improper conduct, and specifically pray that the Court grant the following relief to Plaintiff:

a. Declare that Section 122 does not grant the President the statutory authority to unilaterally impose the challenged tariffs;

b. Declare that the President has not identified a valid balance-of-payments deficit as required by Section 122 and that the continued existence of trade deficits in goods is not itself a balance-of-payments deficit;

c. Declare that, if Congress had granted the President the unilateral authority to impose tariffs provided by the Section 122 Proclamation, it is an unconstitutional delegation of legislative power;

d. Declare that the Section 122 Proclamation is invalid as contrary to law and is *ultra vires* of Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, as applied to Plaintiff.

e. Declare that the duties imposed under the Section 122 Proclamation on Plaintiff's entries are unauthorized by law;

f. Enjoin the operation of the Section 122 Proclamation;

g. Award Plaintiff damages in the amount of any tariffs collected by Defendants pursuant to

the challenged orders, with interest as provided by law;

h. Award Plaintiff other such damages as are appropriate;

i. Award Plaintiff its attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

j. Grant any such other relief as this Court may deem just or proper.

Respectfully submitted,

Date: November 6, 2026

Eric R. Rock, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6191 (telephone)
erock@rocktradelaw.com (e-mail)